UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARIA FERNANDA ELOSU and ROBERT LOUIS BRACE, Individuals,<br><br>           Plaintiffs,<br><br>     v.<br><br>MIDDLEFORK RANCH INCORPORATED, an Idaho Corporation,<br><br>           Defendant. | Case No. 1:19-cv-00267-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are Defendant Middlefork Ranch Incorporated's Motion to Exclude Expert Testimony Pursuant to *Daubert* and Federal Rule of Evidence 702 (Dkt. 34) and Plaintiffs Maria Fernanda Elosu and Robert Louis Brace's Motion to Strike Arguments Made for the First Time on Reply (Dkt. 38).

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

Upon review, and for the reasons set forth below, the Court DENIES Plaintiffs' Motion to Strike and GRANTS in PART and DENIES in PART Defendant's Motion to

Exclude.

## II. BACKGROUND

### A.  Factual Background

Plaintiffs are individuals who owned a vacation cabin in the Frank Church Wilderness area east of McCall, Idaho. This cabin—known as Cabin #16—is part of a homeowner's association known as Middlefork Ranch, Incorporated ("MFR").

On July 20, 2017, Cabin #16 caught fire and burned to the ground. Thankfully, nobody was home at the time of the fire. The downside—if there can be said to be one— of nobody being present when the fire started, is that the cause of the fire (specifically where it originated on the property) is unknown. This lawsuit is about that unanswered question. Some details about the cabin's design, and events leading up to the fire, are helpful for context.

Cabin #16 had a "wrap around" covered deck that extended along the entire east side of the cabin and partially around the north and south sides as well. Plaintiffs had a propane-fired refrigerator on the north deck of the Cabin. This refrigerator had a pilot light—an open flame similar to a candle—which kept it running.

The day before the fire, Plaintiff Robert Brace stained various surfaces of the decks and posts with an oil-based stain sold under the brand "Penofin." Pursuant to the manufacturer's specifications, Penofin oil becomes dry to the touch roughly four hours after application and is serviceable after 12 hours. Dkt. 36-2, at 114. Per these recommendations, any excess oil should be wiped off with rags, and the rags soaked in a bucket of water, to "avoid the possibility of spontaneous combustion which can occur with

any oil-based product." *Id.* Brace applied the Penofin stain up to and around the refrigerator on the north porch, but not underneath it. Brace also, by his own admission, applied this stain liberally. In fact, it appears Brace exceeded the manufacturers' recommendations for how much stain should have been used. He did so because, in his opinion, the wood seemed to "soak it up." Dkt. 36-9, at 5. That evening, Plaintiff Fernanda Elosu and a guest smoked cigarettes while sitting on the newly stained deck.

The next morning, Brace found cigarette ashes on the new deck. He also noticed, as did Elosu, that there were still some sticky spots on the deck where the oil stain had pooled and failed to dry properly. Plaintiffs attempted to clean up the wet spots with cotton rags.

Brace left the cabin about 8:00 am the morning of July 20, 2017. Sometime that morning, an MFR employee came by to check the propane refrigerator on the north deck. Finding the propane low, the employee changed the propane and, with Plaintiffs' son's help, relit the pilot light. Elosu claims that she had an uneasy feeling about relighting the pilot light and expressed some concern to the employee. Nevertheless, she allowed the employee to ignite the pilot light and he left the property.

Around lunchtime, Elosu and her children left the cabin to go swimming. Around 4:00 pm, a fire started somewhere in or around Cabin #16 that eventually consumed the whole property.

The first people to notice the fire were a group of contractors building a cabin next door to Cabin #16. When these individuals first arrived, they testified that the fire was located on the east deck, near the southeast corner. Some went around the Cabin banging

on windows and doors to ensure nobody was inside. These witnesses tried to extinguish the fire, to no avail, and as noted, the cabin was a total loss.

Four days after the fire—on July 24, 2017—Plaintiffs' homeowner's insurance, Farmers Group, retained and sent a fire expert—Steve Hartgrove—to Cabin #16 to investigate the fire. Hargrove described the scene as a "black hole," noted he could not determine the origin of the fire, and (while not ruling it out) noted that there was no evidence to support the theory that the fire was caused by the pilot light on the propane refrigerator on the north deck.

MFR's insurer, Philadelphia Insurance, also retained an expert—Glenn Johnson—who conducted a scene investigation on September 25, 2017. After interviewing various MFR employees and cabin owners, Johnson and Hartgrove jointly interviewed the contractors who had responded first to the fire.

All of the contractors interviewed confirmed that the fire was initially located on the east deck of the cabin and that there was no fire on the north side of the building. Of particular interest was Regee Rauch's testimony. Rauch stated that he went around the cabin banging on windows to make sure nobody was inside. Rauch confirmed that when he went around the north side of the cabin and pounded on the windows near the refrigerator, there was no fire and no flames around the refrigerator, only smoke.

Johnson, like Hartgrove was unable to determine on a more probable than not basis what caused the fire. Because of unresolved questions surrounding Brace's application of the oil stain, Johnson opined that it was possible the fire was a result of spontaneous combustion. However, in light of the disinterested witness statements, he concluded the

fire's point of origin was on the east deck, not the north deck.

Following these investigations, Plaintiffs homeowner's insurer paid its policy limits to Plaintiffs and waived any potential subrogation claim against MFR.

Thereafter, Plaintiffs retained their own fire investigator—Michael Koster—out of California (Plaintiffs are themselves California residents), who visited the scene in May 2018, roughly ten months after the fire. Plaintiffs also retained a mechanical engineer, Richard Mumper, to conduct various lab tests. Koster and Mumper ultimately concluded that the fire had started on the north deck and was the result of oil vapors being ignited by the pilot light on the propane fridge.

### B.   Procedural Background

Plaintiffs filed their Complaint on July 11, 2019. Dkt. 1. Plaintiffs' theory of the case is that after Brace stained the decks at Cabin #16, excess oil flowed through the deck boards and was trapped in the space between the ground and the deck. This excess oil stayed wet for some time and, during the hottest parts of the following day, began to evaporate. After MFR's employee relit the refrigerator pilot light, it was only a matter of time before those flammable vapors reached the flame and ignited. Plaintiffs' sole claim in this case is for negligence against MFR. MFR denies the allegations and instead contends the fire started as a result of Plaintiffs' actions. To be sure, MFR believes the fire was an accident, but puts forth the theory that either Brace's actions in applying the stain (and/or cleaning the stain and disposing of the staining materials) or Elosu's smoking are linked to the fire's origins.

As a result of the District of Idaho's heavy caseload, this case was reassigned to

Judge Robert J. Bryan from the Western District of Washington shortly after it was filed. Dkt. 3. Judge Bryan presided over the case for approximately one year. After denying the parties' cross-motions for summary judgment, Judge Bryan transferred the case back to Idaho for trial. Dkt. 26.

On October 23, 2020—in anticipation of trial—MFR filed its Motion to Exclude Expert Testimony. Dkt. 34. Plaintiffs responded (Dkt. 36) and MFR replied (Dkt. 37). Plaintiffs then filed a Motion to Strike part of MFR's reply memorandum. The matters are now ripe for adjudication.

Because the Motion to Strike seeks to limit what evidence the Court can consider in its analysis of MFR's Motion to Exclude, the Court will address that motion first.

## III. ANALYSIS

### A. Motion to Strike

In their Motion to Strike, Plaintiffs contend that MFR argued in its reply, for the first time, that Plaintiffs' experts (Koster and Mumper) reached their opinions only after alleged undue influence by the Plaintiffs. MFR supported this proposition with excerpts of deposition testimony from two other witnesses—Kenny Pyle and Shane Hartgrove—both of whom claim Plaintiffs called them and tried to get them to change their testimony. The implication being, that because Plaintiffs purportedly tried to get *some* witnesses to change their testimony—and because it took them so long to retain experts who supported their theory of the case—they must have influenced the experts as well. This, however, is mere supposition. As will be explained below, Koster and Mumper admit they received most of their knowledge about the case from Plaintiffs, but there is no testimony (similar to Pyle

and Hartgrove's testimony) suggesting Plaintiffs unduly or inappropriately influenced their actual expert opinions.

Nevertheless, Plaintiffs move to strike two pages of arguments in MFR's reply brief claiming that MFR waived this argument by failing to raise it in its original brief in support of its Motion to Exclude Expert Testimony.

The Court agrees that parties "cannot raise a new issue for the first time in their reply brief." *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 514 (D. Idaho 2013) (quoting *State of Nev. v. Watkins,* 914 F.2d 1545, 1560 (9th Cir. 1990) (cleaned up)); *see also Bazuaye v. INS,* 79 F.3d 118, 120 (9th Cir. 1996) ("[i]ssues raised for the first time in a reply brief are waived."). However, the arguments Plaintiffs seek to exclude are not truly new. To be sure, the idea that Plaintiffs unduly influenced Koster and Mumper's opinions is much more developed in MFR's reply brief—as are the quoted passages from the witness's testimony—but these same arguments were raised in its opening brief.

MFR clearly stated its opinion that Plaintiffs' experts "spoke only to Plaintiffs and accepted and relied solely on their version of disputed facts." Dkt. 34 at, 10. *See also* Dkt. 34, at 20 (alleging that Mumper's opinions are "simply restatements of Plaintiffs' version of disputed facts"). In addition, while not specifically calling out the testimony it did in its reply, MFR included the deposition transcripts of both witnesses in support of its opening brief. *See* Dkt. 35-1, at 168, 220. In short, the Court will not strike pages 2 and 3 of MFR's reply brief and will give those materials the weight it deems appropriate. The Motion to Strike (Dkt. 38) is DENIED.

### B. Motion to Exclude

#### 1. Legal Standard

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (cleaned up).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. The test for reliability, however, "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1318 (9th Cir. 1995) ("Daubert II"). To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564. These factors are "helpful,

not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (cleaned up).

"When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006). Additionally, reliable testimony must be helpful. *See Daubert,* 509 U.S. at 591 ("'Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful.'") (quoting 3 Weinstein & Berger ¶ 702[02], p. 702–18.)). "A court may exclude testimony that falls short of achieving either end." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).

The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Comm. Notes.

*2. Discussion*

In its Motion to Exclude Expert Testimony, MFR asks the Court to do each the

following:

1. Exclude the opinions of Plaintiffs' experts that are advanced without sufficient factual or scientific basis, including:

    i. Plaintiffs' fire investigator, Michael Koster's speculative and unsupported opinion regarding the cause and origin of the fire;

    ii. Plaintiffs' mechanical engineer, Richard Mumper's opinion regarding the cause of the fire that is unrelated to his engineering expertise; and

    iii. Mr. Mumper's legal conclusions and factual statements.

2. Exclude untimely materials and expert analysis not contained in expert reports, not disclosed in accordance with Court Order or civil rules, and not relied upon as a bases for opinions. This includes questionable "experiments" and analyses for which Defendant had no fair opportunity to respond:

    iv. Spontaneous combustion "testing" performed by Mr. Koster and chemist Doug Byron in Mr. Koster's back yard;

    v. Mr. Mumper's air flow analysis and related computer modeling.

Dkt. 34, 1-2. The Court will address each request in turn.

  a. <u>Unsupported Expert Opinions</u>

    *(i) Koster's Opinion Regarding the Cause and Origin of the Fire*

Plaintiffs retained Michael Koster as their primary fire cause-and-origin investigator and properly disclosed him as an expert witness. Approximately ten months after the fire, Koster visited the scene, processed evidence, and conducted an investigation. Dkt. 36, at 7. After doing so, he disclosed a 145-page[1] report detailing his methodology and conclusion

---

[1] While the report is 145 pages in total, only about 20-25 pages of the 145 are substantive in nature. The remaining 120+ pages are photographs, charts, and other supporting documents. Even of the substantive materials, much of Koster's report is spent calling into question Johnson and Hartgrove's reports and conclusions, not setting forth facts and evidence to support his own. Dkt. 36-2.

to the parties. Dkt. 36-2. In his report, Koster states that:

> After a complete analysis of the fire scene, heat oxidation patterns, fire movement patterns, and overall mass loss affecting the remains of the structural members, a review of the video footage, photographs, review of all interviews and transcripts, and a complete review of all the data provided to this investigative firm, I concluded that this fire had originated along the north side of the residence.

Dkt. 36-2, at 12-13.

MFR seeks to exclude Koster's conclusions because it believes Koster was unable "to detail the specific findings regarding each of these various bases for his opinion," and that "Koster acknowledged that there is no physical or testimonial evidence to support the theory that the fire started on the north deck." Dkt. 34, at 14.

The Court begins by noting that MFR does not challenge Koster's credentials. Nor does MFR challenge Koster's methodology in itself. To be sure, MFR casts aspersions on how Koster undertook his investigation, but only in the context of their larger concern: his ultimate conclusions. MFR's main challenge is that Koster's opinions are speculative and unsupported by the evidence. Under the circumstances, the Court must agree.

When Koster was asked during his deposition to point to specific evidence in support of his conclusions, he was largely unable to do so. Although Koster was able to point to various factors that influenced his opinion, each of those factors have numerous alternative explanations that could lead to alternative outcomes as well. Thus, while these factors are in existence, Koster confirmed that there is no concrete physical or testimonial evidence to support his theory that the fire started on the north deck.

MEMORANDUM DECISION AND ORDER - 11

As an example: Koster claims that his opinion is based, in part, on heat oxidation patterns and the idea that the oxidation (accelerated rusting on metal surfaces or objects) he observed indicated "more significant heat" on the north side of the cabin. However, Koster was quick to admit that this type of oxidation was also consistent with the fact that there were strong south-to-north winds the day of the fire. Dkt. 35-1, at 16. In light of this competing interpretation, Koster could not affirmatively say the oxidation patterns proved the fire started on the north deck. *Id.* at 14-15.[2]

A second example is even more stark. In his report, Koster explained that a review of various interviews and transcripts helped form his opinion that the fire started on the north deck. But under questioning, Koster admitted that none of the witness interviews or transcripts support his theory:

> Q: Is there anything in Mr. Pyle's deposition that supports your theory of the ignition source being on the north side of the deck?
> A: No.
> Q: Okay. Is there anything in Mr. Rauch's testimony which supports your theory of the fire starting on the north deck?
> A: No.
> Q: And, in fact, he testified that he stood right next to the north deck pounding on windows and there was no fire there, correct?
> A: Absolutely.

---

[2] Relatedly, Koster's summary indicates that other factors support his "oxidation" theory, and yet, when questioned, he had to admit that was not entirely true.

> Q. Explain what you are saying. When you're saying the heat oxidation patterns, fire movement patterns, mass loss on the north side are indicative of first starting on the north side.
> A: It's a greater amount of mass loss specifically on the north/northeast side compared to anywhere else in the structure.
> Q: And yet the video and your fire height calculations show that the fire was greater on the east deck rather than the north side?
> A: That's correct.

Dkt. 35-1, at 18.

> Q: Okay. And was there anything in Mr. Gamez's deposition testimony that supports your theory of the fire starting on the north deck?
> A: No, it does not.

*Id*. at 20-21.[3] This pattern continues for each topic upon which Koster claims he relied when forming his opinion.

Particularly of note is the fact that Koster's ultimate opinion is that excess oil from the deck seeped between the boards into the ground underneath the deck, that it was hot the day of the fire (causing the oil to evaporate), and that these vapors were ignited by the propane refrigerator's pilot light. Koster admits however, that he has no data or objective evidence to support such a theory and that he based his conclusion on things Brace had told him about the events over those two days in 2017,[4] as well as on his own experience.

---

[3] Again, Koster was forthcoming in his answers—as he should have been—but each answer undercuts his theory of the case. On this same topic of whether the interviews and transcripts were helpful, Koster further explained:

> Q: [D]o any of the interviews or transcripts support that theory [that of the ignition sequence starting on the north deck]?
> A: No.
> Q: In fact, have you spoken with any of the contractors who were first to the scene?
> A: No, I have not.

Dkt. 35-1, at 19.

[4] By way of example:

> Q: Do you have any objective evidence one way or the other to corroborate any of [Brace's] statements [about how the deck was stained and/or when the fire started]?
> A: No, no.

Dkt. 35-1, at 22.

> Q: Any other witnesses that you're aware of that have testified or that will testify that there were puddles on that deck the following day?
> A: No, I have not.

*Id*. at 24.

One naturally wonders then, how exactly did Koster reach the conclusions he did. When asked this exact question, Koster's response was that he had to "look at every angle or every possibility, not even proving, but trying to disprove other causes." *Id*. at 10. Koster explained that his conclusion was but a "hypothesis," and his goal was to try and "disprove it" and because he couldn't disprove it, "then there's a high probability that it did occur." *Id*. at 51.[5]

Thus, Koster's "more likely than not" conclusion is not based on actual supporting evidence but simply the absence of conflicting evidence. While the Court understand the

---

      Q: But we don't know and you don't have any objective evidence to know how much [oil] was used, correct?
      A: That is correct.

*Id.* at 28.

      Q: You don't know . . . what the concentration [of the oil stain was] or what the amounts are or anything like that?
      A: I'm going to have to say no to that.

      *Id.* at 30.

      Q: Do you have any data as to the temperature of the void space underneath the deck . . .?
      A: No, I don't.

*Id*. at 32.

      Q: But do you have any specific data as to what the wind was at Pistol Creek at that time?
      A: No.

*Id*. at 33.

      Q: And you mentioned hypothetically if there's a puddle underneath the deck. But we don't know if that was the case, correct?
      A: We don't know.

*Id.* at 36.

[5] Koster phrased this concept another way, stating that "if you can't disprove [your hypothesis], then that could be a potential working hypothesis that you're going to move forward with." Dkt. 35-1, at 51-52.

MEMORANDUM DECISION AND ORDER - 14

concept—and could see its utility in some circumstances—such an "inversely achieved" conclusion has little merit in this case when there is so much evidence to the contrary.

The Court next turns to some of Plaintiffs' arguments *against* exclusion to illustrate this point.

First, Plaintiffs assert that this is the classic "battle-of-the-experts" scenario and that Koster should be allowed to testify, MFR can cross examine him on all topics, and the jury can determine who is correct. Plaintiffs argue that were the Court to take this chance away from the jury at this stage, it would be impermissibly making factual determinations. The Court disagrees. The above are not factual calls—at least not in the way Plaintiffs imply. The Court will explain.

Plaintiffs are correct that the Court's role at this stage is *not* to accept or reject certain versions of the facts, but to simply act as a "gatekeeper." As a gatekeeper, however, the Court has an obligation to ensure expert testimony is reliable. *Kumho Tire Co., Ltd., v. Car Michael, etc.*, 526 U.S. 137, 141 (1999). As Plaintiffs correctly note: "The Court's gatekeeping role is to determine whether sufficient facts exist to support the conclusion Mr. Koster has reached – not to announce, 'whether one party's version of the facts should be credited.'" Dkt. 36, at 12 (citing *United States v. Idaho Cty. Light & Power Coop. Ass'n, Inc.*, No. 3:17-CV-00391-CWD, 2020 WL 603478, at *10 (D. Idaho Feb. 7, 2020) (cleaned up)).

So, while the Court must not accept one set of facts over another, or weigh the evidence and testimony before it, it must, nevertheless, determine if there are facts to

support the various conclusions in the first instance. By Koster's own admissions, there are not facts to support his conclusions.

Neither side—nor the Court—disputes that Brace used copious amounts of oil when staining the deck. In like manner, nobody disputes there was an open flame on the fridge, and nobody disputes that oil evaporates and can combust without warning.[6]   But when there are multiple eye-witnesses who claim there was no fire on the north deck when they got to the scene (immediately after the fire started no less) for an expert to conclude the north deck is where the fire started is problematic. On top of that, here, the expert himself admits there is no evidence to confirm his theory. Koster's opinion is instead based only on the idea that since his theory cannot be *disproved,* it is possible.[7]

In short, this is not the classic battle of the experts because one expert has admitted that the only way to prove his theory is a negative assumption. The Court does not make this decision lightly, but it cannot allow such an unsupported opinion to be presented to a jury.

---

[6] The Court is speaking broadly here. There are some nuances and disagreements about how much oil was used and whether that was truly in excess of the recommended amount; there are also disagreements about whether the pilot light went out during the night or was still on when MFR's employee came to the house. The Court's point, however, is that Plaintiffs' assertion that the Court is making factual determinations in accepting MFR's position *on this motion* is inaccurate. The Court is not approving or denying any one fact; it is approving or denying the conclusions based upon the evidence (or more accurately, lack thereof) upon which Koster testified he relied. Here, the Court cannot approve of an opinion (a viable opinion in the abstract) on facts (that the Court will assume are true) without any concrete evidence to support it.

[7] Again, had Koster been able to point to any concrete evidence to disprove the other theories at play in this case or to any evidence that would support the idea that his theory couldn't be disproved, such might have been admissible. The problem, however, is that evidence exists which supports the other theories in this case as well as evidence which contradicts his theory. Ultimately, given Koster's admission that his opinion is contrary to eyewitness statements, is based in large part on information obtained from Plaintiffs, and lacks any real evidence in support, the Court cannot find Koster's opinion rests upon a reliable foundation.

Second, Plaintiffs repeatedly assert that Koster's theory is no different from any other expert theory because all theories are, by their nature, speculative. Again, the Court understands Plaintiffs' argument and this concept, but its application in this case is suspect. To be sure, Koster's theory of the case is a "working theory," but even as such, he must still provide *something* concrete (i.e. not simply a myriad of assumptions and negative inferences) in support of that theory for it to be taken seriously. Again, Koster's working theory is directly contradicted by multiple eye-witness accounts. It does appear that Koster relied upon the testimony and representations of Plaintiffs, as opposed to that of multiple eyewitnesses.[8] In addition, Plaintiffs try to compare Koster's report and working theory to MFR's expert Glen Johnson's report because Johnson used words such "possibly" when reaching his conclusions. While this is true, the Court notes that Johnson based his conclusions on other independently verifiable facts and supporting evidence.

Third, and finally, the whole idea that Koster based his theory on a lack of contradictory evidence rather than putting forth supporting evidence is, to some degree, backward. Again, while this concept may be helpful in evaluating certain evidence, such is not sufficient for the Court's purposes today. The Court acknowledges that the inability to disprove a *properly supported* theory would bolster the persuasiveness of that theory.

---

[8] Koster admitted in his deposition that he discounted other possible explanations for the cause of the fire (such as spontaneous combustion from rags or a mop) based "solely off of the information that was given to me by Mr. Brace." Dkt. 35-1, at 13. While this example does not rise to the same level of concern as Brace and Elosu allegedly asking witnesses to change their testimony, it concerns the Court that an expert relied on an interested party's version of the facts without conducting any independent investigation to verify such statements. Furthermore, the above example was not an isolated event. Koster admitted other such assumptions—some more important than others. For example, Koster admitted he had no evidence there was a plastic barrier underneath the deck, but that Brace had told him there was one and that he took Brace at his word without verifying the information. *Id.* at 29.

MEMORANDUM DECISION AND ORDER - 17

However, failing to disprove a theory that is speculative in the first place is not all that impressive. This type of reasoning would swallow the rules as applied to experts if allowed. If an expert could throw out any idea—and claim that so long as it remains unproven it's a viable option—without oversight, the Court's gatekeeping role is meaningless.

In conclusion, the Court finds that Koster's testimony does not "rests on a reliable foundation," *Kumho Tire*, 526 U.S. at 141, and it will not allow such a speculative, unsupported opinion to be presented to a jury for consideration. MFR's request that Koster's opinion be excluded is GRANTED.

*(ii) Mumper's Opinion Regarding the Cause of Fire Allegedly Unrelated to Expertise*

Plaintiffs hired Richard Mumper, an engineer, to examine the remnants of the propane refrigerator and other appliances to confirm that the fire was not caused by an electrical fault or mechanical malfunction. MFR asks the Court to exclude Mumper's opinion regarding the cause of the fire, primarily because he is not a certified fire investigator.

Mumper readily admits that he is not a fire investigator. Dkt. 35-1, at 56. He also admits that he never visited the site of the fire. Instead, Koster provided Mumper with certain physical evidence which he examined in his laboratory to see if he could determine whether or not those materials contributed to the fire. He ultimately concluded that there

was no mechanical or electrical failure that caused the fire. Mumper further confirmed that nothing in his analysis would shed *any* light on the origin of the fire. *Id.* at 76.[9]

After this admission, however, Mumper goes on to opine that the cause of the fire was the refrigerator pilot light. He bases this opinion on information he gleaned from Brace, Koster, and others. The problem with these statements, however, is that such a conclusion *might* not be within Mumper's area of expertise and/or *might* lack appropriate foundation. The Court says "might" because, while Mumper is not a fire investigator, he owns a firm that specializes in providing technical and engineering expertise to fire investigators, among other things. Thus, Mumper appears to have sufficient qualifications and expertise to, generally speaking, opine on such topics. The Court's concern, however, is where Mumper's conclusions came from and whether he was actually asked to form such an opinion in this case. By all accounts, it appears Mumper was hired to only address whether the refrigerator (or other appliances) malfunctioned. He was not hired to opine on the origins of the fire. Mumper did not independently investigate these critical issues and appears to have formed his opinions on these topics based almost exclusively on information he obtained from Brace and Koster.[10]

---

[9] Q: [I]s there anything that you found during your laboratory testing that would shed any light on the origin of the fire?
A: Not on the laboratory inspection.

Dkt. 35-1, 76.

[10] Mumper explains that he reviewed some witness statements, as well as reports from other experts, however, he also clearly states that he did not visit the scene, talk with any witnesses, or do any independent investigation into the cause and origin of the fire.

So, while Mumper can surely testify concerning his opinion that "there was no evidence discovered to date to suggest that the fire occurred due to a malfunction involving another appliance" (Dkt. 36-3, at 11), he cannot testify concerning his opinion that "the fire was caused by the ignition of a known flammable liquid and vapor by an open flame located at the recently lit pilot of the deck refrigerator" or that "the opinion set forth by others that the fire was caused by rags piled on top of the deck lack[s] substantiating evidence" *without proper foundation. Id*. Again, Mumper is a mechanical engineer, and appears to have been retained to opine on the mechanical issues in this case, not the origins of the fire.

In short, this request is GRANTED in PART and DENIED in PART. Mumper can testify about the tests he ran, his conclusions about those tests, and his opinion that those things *did not* start the fire. Whether he can testify more generally about what *did* cause the fire can only be determined once the Court hears his testimony and determines if the proper foundation has been laid and whether notice was properly given to MFR in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

This later discussion—about other conclusions Mumper reached—dovetails into MFR's second request. Thus, the Court will continue that discussion below.

*(iii) Mumper's Legal Conclusions and Factual Statements*

MFR outlines numerous other statements Mumper makes in his expert report and asks the Court to exclude them because they are either legal conclusions or factual statements. For example, Mumper opines that "the fire did not occur due to the actions or inactions on the part of the Brace family." Dkt. 36-3, at 11. MFR claims this is a legal

conclusion.[11] It is that, but it is also a factual determination that has not been conclusively proven. Either way, this is not a conclusion Mumper can likely make.

Mumper readily admits that he does not have any laboratory evidence to support the aforementioned conclusions. They are simply conclusions he reached based on information gathered during his work on this case. Given this, such opinions are not admissible testimony that would aid the jury.

Again, insofar as there is some mechanical engineering opinion that can be derived from any of these events, Mumper can so testify. In addition, if Plaintiffs can lay the appropriate foundation, Mumper could potentially opine on these other topics. That said, it goes without saying that an expert cannot give testimony outside of his area of expertise, cannot give opinions on legal conclusions, and must support opinions related to unresolved factual disputes with the proper foundation.

Thus, this request is likewise GRANTED in PART and DENIED in PART. Mumper can testify to his mechanical conclusions. He can also testify as to anything he has personal knowledge of, that is supported by his investigation and other appropriate foundation, and was properly disclosed. He cannot testify to other matters. The Court does not know everything Mumper will say during his testimony and thus it will be up to MFR to raise any appropriate objections which the Court can deal with in due course.

b. <u>Untimely Expert Materials</u>

---

[11] Similarly, Mumper makes conclusions about the "rags" Brace used to clean up the excess oil as well as other open factual disputes surrounding Brace's application of the oil to the deck surfaces.

MFR's final two requests relate to certain materials produced by Koster and Mumper on the eve of the discovery cut-off.

Per the Court's Order Setting Trial and Pretrial Date, the deadline for expert witness disclosures was January 10, 2020. Dkt. 13. On that date, MFR disclosed Johnson's fire investigation report (which was actually previously disclosed in October 2017). At that time, Plaintiffs produced updated reports from their fire investigator, Koster, and mechanical engineer, Mumper (because again these two had already produced pre-litigation reports). MFR disclosed a Rebuttal report from its fire expert, Johnson, on February 10, 2020. Plaintiffs did not disclose any Rebuttal report from their experts. The deadline for all fact discovery was February 28, 2020.

On the evening of February 25, 2020—forty-five days after the expert report deadline, fifteen days after the deadline for rebuttal reports, and two days before the discovery cut-off—Plaintiffs sent MFR supplemental documents. This late production disclosed two experiments: a combustion testing experiment performed by Koster, and an air flow modeling experiment performed by Mumper. MFR's counsel was travelling on February 26, 2020, to California to depose Koster and Mumper. These depositions occurred on February 27, 2020. MFR claims that it did not have a chance to review this lately filed discovery prior to the discovery cut-off. It thus objects to the late disclosure and seeks the exclusion of the materials at issue.

Plaintiffs point out that this request is more of a discovery complaint as opposed to a *Daubert* motion. To some degree, the Court agrees. MFR could have brought this situation to the Court's attention months ago. It could have asked for an extension of the

discovery deadline, or other appropriate relief, but failed to do so. Then again, Plaintiffs could have done so as well. After all, it was their production that was outside the prescribed timeframes. The parties' failure to address this matter in a timelier fashion notwithstanding, the fact remains that these experiments were performed by experts and are thus expert opinions that should have been disclosed in compliance with Federal Rule of Civil Procedure 26. That is the Court's bigger concern. Regardless of timing, Plaintiffs failure to properly disclose these materials means they cannot be used at trial.[12]

Rule 26 requires parties to disclose all expert evidentiary material that may be relied upon at trial, and further provides that these disclosures be made at the times directed by the court. Fed. R. Civ. P. 26(a)(2)(C). Moreover, pursuant to Rule 26(e), a party is under a duty to supplement a Rule 26(a) expert report "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties . . . ." Fed. R. Civ. P. 26(e). "Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir.2001). This rule excludes untimely expert witness testimony, unless the "parties' failure to disclose the required information is substantially justified or harmless." *Id.*

---

[12] Thus, while this is not strictly a *Daubert* motion, it is a pre-trial motion which the Court must rule upon in light of the upcoming trial.

Plaintiffs have offered little by way of explanation that might justify their late disclosure.[13] They essentially claim that these materials were not truly new, but were simply supplemental to prior opinions that MFR was already aware of.[14] Even taking this explanation as true, Plaintiffs were nevertheless required to produce a supplemental report under Rule 26. Expert witnesses performed the two experiments in question, therefore any testimony at trial regarding those experiments would be expert testimony. As such, Plaintiffs were under an obligation to disclose these experiments to MFR via supplement. Plaintiffs have offered no excuse for this oversight. Thus, the timing of the production, coupled with the manner of the production (or lack thereof), leads the Court to conclude that such materials must be excluded.

In summary, because these expert experiments were not timely or properly disclosed, Plaintiffs cannot present them to a jury for consideration. MFR's Motion as to this request is GRANTED.

---

[13] Again, the Court can scarcely use the word disclosure because, as noted, the materials were not included in any supplemental expert report or disclosure, but were simply produced to MFR.

[14] Additionally, Plaintiffs specifically point out that they produced the air modeling experiment a mere six days after Defendant's expert's deposition—in which the topic was brought up—and that Defendants *could have* responded. Again though, rather than both sides trying to produce reports or supplements with only days to spare in discovery, Plaintiffs could have simply approached the Court to ask for an extension (among other potential solutions), instead of producing the materials 48 hours before the deadline. And with depositions scheduled during that same timeframe, Plaintiffs can hardly be surprised that MFR did not review, let alone respond, to their materials.

## IV. ORDER

1. MFR's Motion to Exclude (Dkt. 34) is GRANTED in PART and DENIED in PART as outlined above.

2. Plaintiffs' Motion to Strike (Dkt. 38) is DENIED.

DATED: January 22, 2021

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 25