UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARIA FERNANDA ELOSU and ROBERT LOUISE BRACE, Individuals,<br><br>        Plaintiffs,<br><br>v.<br><br>MIDDLEFORK RANCH INCORPORATED, an Idaho Corporation,<br><br>        Defendants. | Case No. 1:19-cv-00267-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are Plaintiffs Maria Elosu and Robert Brace's Motion to Alter Judgment to include Post-Judgment Interest (Dkt. 116) and Defendant Middlefork Ranch Incorporated's ("MFR") Motion to Amend/Correct Judgment (Dkt. 119), Motion for New Trial (Dkt. 120), and Motion for Judgment as a Matter of Law or for New Trial (Dkt. 121).

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

For the reasons outlined below, the Court DENIES all of MFR's Motions and DENIES as MOOT Plaintiffs' Motion.

## II. BACKGROUND

The facts and history of this case are well known to both parties and the Court will only include a brief recitation here of certain facts necessary to put the pending motions in context.[1]

Plaintiffs Maria Elosu and Robert Brace owned a cabin, known as Cabin #16, in the Frank Church Wilderness area east of McCall, Idaho. Cabin #16 was located in Pistol Creek Ranch and was a part of the MFR's Homeowner's Association. Pistol Creek Ranch is very remote and not accessible by road.

On July 19, 2017, Plaintiff Brace stained the decks of Cabin #16 with an oil-based stain. Brace, by his own admission, applied too much stain to the decks. On the morning of July 20, 2017, an MFR employee changed out a propane tank and relit the pilot light of an outdoor refrigerator located on the north deck of Cabin #16.

Later that day, Cabin #16 caught fire and burned to the ground. The parties dispute what caused the fire—MFR's employee who lit the pilot light, Brace's excess deck staining and spontaneous combustion, or something else entirely.

Following various investigations (wherein the cause of the fire was never conclusively determined), Plaintiffs' homeowner's insurance policy paid them $544,000. As will be explained below, Plaintiffs' homeowner's insurance originally waived subrogation. Plaintiffs eventually filed this lawsuit alleging a single cause of action against MFR: negligence. In preparation for trial, MFR filed a Motion to Exclude some of Plaintiff's

---

[1] For a more in-depth factual history, *see* Dkt. 44 at 2–5.

MEMORANDUM DECISION AND ORDER - 2

expert witnesses. Dkt. 34. The Court granted MFR's Motion because it determined Plaintiffs' expert's opinions were too speculative. *See generally* Dkt. 44. This ruling effectively ended Plaintiffs' case. Accordingly, the parties stipulated to dismissal so MFR could pursue an appeal of the Court's decision. Dkt. 47. Ultimately, the Ninth Circuit reversed the Court's decision and held that Plaintiffs' experts' conclusions should be presented to a jury for consideration. Dkt. 56.

A five-day jury trial began on July 11, 2022. At the close of Plaintiffs' case-in-chief, MFR moved for judgment as a matter of law. [2] MFR argued Plaintiffs had not proven their case because there was a "total lack of competent expert evidence to support their theory" of how the fire started. Dkt. 112, at 110. Noting the parties had been down this road before—with the Motion to Exclude and Ninth Circuit's reversal—the Court denied MFR's motion at that time. *Id*. at 114.

Ultimately, the jury found in favor of Plaintiffs and awarded damages in the amount of $1.5 million. Dkt. 101. The jury also found, however, that Plaintiffs were contributorily negligent for the fire. *Id*. They apportioned fault 90% to MFR; 10% to Plaintiffs. *Id*. The Court, therefore, entered judgment in favor of Plaintiffs with damages in the amount of $1,350,000.00 (90% of the $1,500,000.00 award). Dkt. 104.[3]

Following the verdict, Plaintiffs filed a Motion to Alter Judgment to Include Post-

---

[2] Often, this type of motion is referred to as a "directed verdict." *See* Fed. R. Civ. P. 50 advisory committee's notes 1984 (referencing the subdivision's title—"judgment as a matter of law"—but noting that "in the interest of simplicity, the traditional term, 'directed verdict,' is retained").

[3] The Court originally entered Judgment in the full amount (Dkt. 103) but then entered an Amended Judgment with the appropriate reduction (Dkt. 104).

Judgment Interest. Dkt. 116.

Defendants also filed three motions: a Motion to Amend/Correct Judgment (Dkt. 119) to exclude certain landscaping costs and insurance proceeds; a Motion for New Trial (Dkt. 120) because of an erroneous jury instruction; and a Motion for Judgment as a Matter of Law or for a New Trial (Dkt. 121) based upon the idea that Plaintiffs' experts failed to establish causation. The Court will address each motion in turn.

### III. ANALYISIS

#### A.  Motion to Alter Judgment (Dkt. 116)

This Motion is straightforward. So too is its resolution.

Plaintiffs filed the instant motion asking the Court to amend its Amended Judgment to include post-judgement interest in accordance with 28 U.S.C. § 1961. Defendants responded by noting that such an amendment to the Amended Judgment is unnecessary because the relief Plaintiffs seek is automatic. Plaintiffs did not reply.

The Court confirms what Defendants have outlined. As the Ninth Circuit has explained, post-judgment interest "accrues from the date of a judgment whether or not the judgment expressly includes it, because such interest follows as a legal incident from the statute providing for it." *Tinsley v. Sea-Land Corp.*, 979 F.2d 1382, 1384 (9th Cir. 1992) (cleaned up).

In sum, Plaintiffs Motion is DENIED as MOOT because the relief they seek will occur naturally. Interest is, and will continue, accruing until satisfaction.

#### B.  Motion to Amend/Correct Judgment (Dkt. 119)

After the fire and subsequent investigations, Plaintiffs filed a claim with their

insurance company, Farmers,[4] pursuant to their homeowner's Policy. Farmers paid Plaintiffs $544,227.80 as follows:

| | |
|---|---|
| Structure: | $449,298.00 |
| Personal Contents: | $50,000.00 |
| Damaged landscaping: | $22,464.90 |
| Clean-up: | $22,464.90 |

MFR filed the present Motion to Amend arguing the Court should amend its Amended Judgment and reduce Plaintiffs' award for two reasons. First, MFR claims Plaintiffs impermissibly included landscaping costs as part of their damages request during trial after admitting they were not seeking reimbursement for those costs during discovery. Alternatively, MFR claims Plaintiffs have already received money for landscaping from Farmers and cannot ask again at trial. Second, MFR claims the jury award must be reduced by the entire amount Farmers paid because Farmers waived subrogation and Idaho law prohibits double recovery. Plaintiffs oppose the Motion on both fronts.

   *1.  Legal Standard*

Fed. R. Civ. P. 59(e) gives district courts considerable discretion to alter or amend a judgment. *Turner v. Burlington N. Santa Fe R. Co*., 338 F.3d 1058, 1063 (9th Cir. 2003). Rule 59(e) motions are granted where the motion is necessary "to correct manifest errors of law or fact upon which the judgment is based" or to "prevent manifest injustice." *Id*. (cleaned up).

---

[4] Plaintiffs refer to this company as "Farmers." Dkt. 18-5, at 7. However, the Company is referred to elsewhere as "Foremost Insurance Company." Dkt. 127-8. Defendants refer to this company as "Farmers/Foremost Insurance Company." Dkt. 131, at 3. The Court believes there is a discrepancy because of a merger between the two companies. Regardless, the Court will refer to this insurance carrier as "Farmers."

   *2. Landscaping*

Early on in this case, Plaintiffs represented that their claim did not consist of any reimbursement request for "personal contents, landscaping or clean up." Dkt. 18-5, at 8.

At trial, however, Plaintiffs' expert, Kenny Pyle, included a line item for "landscaping" in the amount of $19,500.00 as part of his total estimate of $1,541.054.05 representing what it would take to rebuild Cabin #16. MFR—and the Court—expressed concerns about the inclusion of landscaping at the end of trial and noted the discrepancy would need to be fleshed out and dealt with in post-trial motions. Dkt. 113, at 87.

MFR now asks the Court to reduce the jury's verdict by $19,500.00 because: (1) Plaintiffs originally claimed they were not going to ask for any landscaping costs, and (2) Farmers already paid them $22,464.90 for "damaged landscaping." Either way, MFR contends if they are required to pay $19,500.00 for landscaping, Plaintiffs will effectively recover twice for the same loss (i.e. the costs of replacement landscaping).

In response, Plaintiffs claim the landscaping at issue here is different than the landscaping costs they relinquished earlier in the case. They explain that, in Pyle's testimony, he was talking about "grass, rock work, and . . . a sprinkler system." Dkt. 127, at 3. This is true. Those are the landscaping costs Pyle discussed at trial. Plaintiffs go on to say, however, that these landscaping costs are different than the $22,464.90 they already received from Farmers because that money was for trees and shrubs. Or, at least, Plaintiffs imply that is the distinction.

In his declaration, Brace talks about the actions Plaintiffs took based upon MFR's misrepresentations about its insurance coverage with Philadelphia Indemnity Insurance

Company ("Philadelphia"). *See generally* Dkt. 127-1. Those "misrepresentations" will be discussed in detail in the following section. Relevant here, however, Brace claims he originally "fail[ed] to seek money damages for the loss of the surrounding trees and shrubs" from MFR based upon his understanding that there was limited coverage under Philadelphia's policy. Dkt. 127-1, at 3. However, Brace then goes on to say that his own insurance, Farmers, paid $22,464.90 for damaged trees and shrubs. *Id*. at 4. It is not clear whether Brace is saying he failed to seek landscaping damages from Philadelphia *therefore* he sought them from Farmers or if he is saying he failed to seek those costs *at all* and he is just attributing what Farmers paid—under the title "landscaping"—to trees and shrubs. The latter seems likely, considering Brace's final statement that they lost 35 trees in the fire and have made "no claim against MFR for damages to trees and shrubs which are the [l]andscaping we were referring to." *Id*. at 5. "Referring to" seems to be a reference to the landscaping costs Plaintiffs indicated they were *not* seeking during the initial phases of the litigation.

In other words, Plaintiffs' estimated landscaping losses exceed $40,000.00 and they have essentially determined the money they received from Farmers would cover the "trees and shrubs" portion of that loss while the money they sought at trial would be for the grass, rocks, and sprinkler system portion of the landscaping loss. This is an acceptable explanation and illustrates Plaintiffs are not receiving a double recovery on any single loss.

The bigger problem with MFR's argument, however, is there is no way to know if the jury awarded costs for landscaping at all. There was no special, itemized verdict form in this case. Plaintiffs sought $1,541.054.05 in damages. The jury awarded $1,500,000.00.

Whether the excluded amount of $41,054.05 was for landscaping or something else entirely is unknown. Regardless, the Court cannot reduce an award when it does not know the parameters of the award in the first instance.

Because there is no way to know if the jury awarded $19,500.00 in landscaping costs and, *even if they did*, because the money does not appear duplicative of other landscaping monies already received, the Court will not reduce Plaintiffs award by $19,500.00 as requested. This portion of MFR's motion is DENIED.

### 3. *Insurance Subrogation*

In Idaho, a tortfeasor is liable only for those damages that remain after other collateral source payments are considered. The law prohibits any type of double recovery and outlines that:

> In any action for . . . property damage, a judgment may be entered for the claimant only for damages which exceed amounts received by the claimant from collateral sources as compensation for the . . . property damage, whether from private, group or governmental sources, and whether contributory or noncontributory. For the purposes of this section, collateral sources shall not include . . . benefits paid which are recoverable under subrogation rights created under Idaho law or by contract. Evidence of payment by collateral sources is admissible to the court after the finder of fact has rendered an award. Such award shall be reduced by the court to the extent the award includes compensation for damages which have been compensated independently from collateral sources.

Idaho Code § 6-1606.

As noted, Farmers paid Plaintiffs $544,227.80 in August 2017 for the loss of Cabin #16. On or about October 9, 2017, Farmers waived any subrogation claim via email to Plaintiff Brace. Dkt. 17-3, at 22. Plaintiffs readily admit this is what occurred. In fact, they have repeatedly stated Farmers waived subrogation in briefing before this Court and before

the Ninth Circuit. Based upon those representations, the Court has stated this as an undisputed fact in at least three written decisions. Dkt. 22, at 2; Dkt. 44, at 5; Dkt. 85, at 3.

Thus, it would appear relatively straightforward that the Court should simply reduce the jury award by $544,227.80 and be done. Unfortunately, recent events make this decision much more difficult.

Plaintiffs do not dispute Farmers *originally* waived any subrogation claim. However, they assert they have entered into a new agreement with Farmers that rescinds any prior waiver. MFR contends Plaintiffs are bound by their prior admissions under principles of estoppel. Plaintiffs respond they are not so bound because MFR was not truthful during early deliberations and those untruths were the basis of the purported waiver of any subrogation action. In light of recent revelations detailing the true amount of MFR's available insurance coverage, Plaintiffs assert they are allowed to change their position.

The Court will try to unpack this fiasco as clearly as possible.

Plaintiffs avow that, immediately after the fire, they were informed MFR had a singular insurance policy with Philadelphia providing $1 million in coverage. Based upon concerns over sufficient coverage, Plaintiffs sought recovery under their own policy with Farmers and then got Farmers to agree to waive any subrogation believing the only way they would be able to afford to rebuild Cabin #16 was if they had the $1 million from Philadelphia *and* the $544,227.80 from Farmers. Dkt. 127-1, at 3.

Over four years later—and just six months prior to trial—in January of 2022, MFR let Plaintiffs know it actually had another policy with Philadelphia. This second policy was

MEMORANDUM DECISION AND ORDER - 9

a commercial umbrella policy for $2 million.[5] Thus, MFR had liability coverage totaling $3 million, not $1 million as originally believed.

Plaintiffs aver MFR's failure to disclose this additional policy was a nefarious scheme by MFR and/or its counsel to force them and Farmers to "negotiate among themselves based upon untrue beliefs about collectability," "mislead them into untrue beliefs that would cause them to accept something less than what they were entitled to," and force them into an "unfair compromise." Dkt. 127, at 6–7. Plaintiffs argue these falsehoods led Farmers to, "sen[d] an email purporting to waive its claim [of subrogation] precisely because it believed falsely that there was not room in the coverage for its claim." *Id.* at 6.

For its part, MFR rebuffs the insinuation that it purposefully withheld information concerning the second umbrella policy. Its vaguely responds that it either: (1) did not disclose the second policy because discussions early on never exceeded $1 million, so it did not need to; (2) lead counsel for MFR was not "made aware of the umbrella policy," until later in the case, Dkt. 127-3, at 2; and/or (3) Brace was president of MFR's board of directors and should have known about the umbrella coverage.

None of these arguments are persuasive.

First, a party has a duty to disclose all insurance coverage regardless of whether it thinks the claims at issue will reach that amount. *See* Fed. R. Civ. P. 26(a)(1)(A)(iv) (outlining that "*any* insurance agreement under which an insurance business may be liable"

---

[5] Notably, in its initial disclosures served September 15, 2019, MFR only listed the general liability policy with its $1 million in coverage. Dkt. 127-2, at 6.

must be disclosed) (emphasis added). Second, even assuming MFR's counsel did not know of the umbrella policy until later in the case, such does not negate the fact that once he learned of the additional coverage (and relayed that information to Plaintiffs) Plaintiffs needed to reevaluate decisions they had made years prior that had been based on faulty information.[6] And finally, regardless of whether Brace *should have* known about MFR's various insurance policies, emails from that time indicate he *did not*, in fact, know about this additional coverage. Specifically, in an email from May of 2019, Brace indicated the damages they sought at that time ($1.5 million) were "in excess of the policy" and, as a result, they were trying to settle "within the policy limits" at $800,000. Dkt. 127-4. Clearly Brace did not know about the umbrella policy.

Frankly, the Court need not decide *why* the umbrella policy was not disclosed. But, now that it has been, the Court understands why Farmers changed its position on subrogation.

That said, some of Plaintiffs actions are equally concerning to the Court.

First, Plaintiffs did not enter into this new subrogation agreement with Farmers until one month *after* trial. They purportedly knew of the umbrella policy in January of 2022, but did not come to a new arrangement with Farmers until *after* receiving a favorable jury verdict and *after* learning that MFR was going to file a motion to reduce the award based upon Farmer's prior waiver.

---

[6] What's more, the mere fact that MFR's counsel may not have known about the umbrella policy does not change the fact that MFR knew about it and had an obligation to disclose the same. A party cannot withhold information from counsel and then say because counsel did not know about it, there was no duty to disclose.

MEMORANDUM DECISION AND ORDER - 11

The Court's second concern relates to the terms of the new agreement Plaintiffs reached with Farmers. While Plaintiffs aver it is a "clear" subrogation agreement, the terms are anything but. First, while the new agreement rescinds Framer's prior email waiver of subrogation, it states that any recovery from MFR will be shared between Plaintiffs and Farmers "according to a separate Recovery Sharing Agreement." Dkt. 127-8, at 5. It also releases any claim on ten percent of what it has already paid ($54,423.00). *Id*. A "separate sharing agreement" is not a clear indication that any monies received from MFR will be automatically repaid to Farmers. And clearly ten percent will not be.

Cutting through the confusion, two things are (somewhat) clear.

First, Farmers waiver of subrogation has been superseded by a written agreement and that changed position was based upon misrepresentations—inadvertent or purposeful—by MFR.[7]

Second, because there is an active subrogation agreement, the jury award need not be reduced because that amount will be returned to Farmers. Or at least the Court hopes that is the case. It is somewhat odd to have a fee sharing agreement when the purpose of subrogation is to fully reimburse the collateral source that paid money now recoverable from another source. For this reason, MFR asks that, in the event the Court denies the instant motion, it nonetheless deduct whatever amount Farmers "shares" with Plaintiff plus

---

[7] MFR essentially asks the Court to make a firm legal ruling on the validity and enforceability of the new agreement between Plaintiffs and Farmers. It cannot do so. While the court has seen a variety of emails and has some briefing on the issue, that is not squarely before the Court. Additionally, this is not a contracts case; it is a negligence case. The Court's determination as to the contract's validity is ancillary to the larger issue of damages and subrogation. As noted at the end of this section, if the insurance carriers want to battle this out, they can. For the Court's purposes, however, it suffices that the new written agreement supersedes the prior email waiver.

the ten percent ($54,423.00) it has formally abandoned. This makes logical sense to the Court. However, the Court is reluctant to force something on a party when it has not seen the fee sharing agreement.[8] But Idaho Code § 6-6106 is clear: there is no double recovery. The Court expects Plaintiffs to follow the law.

If Philadelphia wants to fight about the new agreement between Plaintiffs and Farmers in different proceedings, so be it. But as for *this case*, the Court finds Plaintiffs' agreement with Farmers supersedes the prior email waiver of subrogation. The full award must be paid, and Plaintiffs shall reimburse Farmers accordingly. There cannot be a double recovery.

This portion of MFR's motion is, likewise, DENIED.

### C. Motion for New Trial (Dkt. 120)

The substance of this motion has, frankly, been an ongoing dilemma throughout this litigation. The Court, and the parties, have addressed—on at least four prior occasions—how any measure of damages should be calculated in this case.

Candidly, it may be easier to simply start fresh and analyze the problem anew. But the fact remains that this issue has already been argued and addressed in multiple written and oral rulings. That MFR continues to disagree, however, does not change the Court's prior findings. Thus, while repetitive, the Court feels it must review the relevant decisions

---

[8] MFR seem to imply Plaintiffs and Farmers are splitting this money in half and Plaintiffs will walk away with a windfall. But for all the Court knows, the reason Farmers said it would "share" in any recoverable proceeds was because it did not want to pony up a lawyer and deal with this issue. Or, alternatively, it has enlisted a lawyer, and it will adjust costs appropriately after seeing how the Court rules. In other words, Farmers may have negotiated this "sharing" agreement to capture other considerations. The Court is not implying that is right or wrong, simply that is does not know the exact terms of the agreement and is reluctant to intervene.

to put this final motion in context.

1.  *Judge Bryan's[9] Decision on Summary Judgment (Dkt. 22)*

The parties' cross motions for summary judgment before Judge Bryan focused almost entirely on how to properly calculate damages. The primary question was whether the possible damages available to Plaintiffs were: (1) the diminution of the fair market value of Cabin #16, or (2) the replacement value of Cabin #16. Dkt. 22, at 7.

MFR argued that, under Idaho law, the maximum amount of damages Plaintiffs could recover was the "fair market value" of Cabin #16 at the time of the fire and nothing more. According to Brace, the fair market value of the cabin when it burned was roughly $350,000.00. That is the amount MFR alleged Plaintiffs could recover.

On the other hand, Plaintiffs argued that, under Idaho law, they could choose between the fair market value of the cabin or restoration costs, and they felt they were entitled to the costs of rebuilding Cabin #16. According to Brace, that amount was roughly $1,264,000.00. That is the amount Plaintiffs argued they could recover.

Judge Bryan rejected both positions as overly narrow.

First, Judge Bryan cited the line of cases in Idaho that explain when a property is injured, but not totally destroyed, the owner is entitled to the fair market value of the property and the fair market value acts as a cap on damages. *Id*. Judge Bryan then reviewed the cases in Idaho that explain when an injury to land is only temporary, the owner is

---

[9] Owing to the judicial shortage in the District of Idaho, this case was reassigned to Judge Robert J. Bryan from the Western District of Washington shortly after it was filed. Dkt. 3. Judge Bryan reassigned the case back to the undersigned prior to trial. Dkt. 26.

entitled to recover the amount necessary to restore the land to its prior condition and there is no cap on damages. *Id*. at 7–8. Judge Bryan then noted an exception to the fair-market-value damages cap in destruction cases which allows a party to exceed the fair market value—effectively using the restorative cost model. *Id*. at 8–10. The exception is utilized when there are valuation considerations that are not taken into account in the fair market value analysis but should be. *Id*. Judge Bryan concluded thus:

> There are issues of fact as to the fair damages. Under Idaho law,
>
> [A] distinction exists between replacement cost and fair market value. However, even the most outspoken critic of so-called replacement-cost valuations would hardly contend that this type of cost has no bearing whatever on value. Such evidence cannot be categorically rejected. Replacement cost ordinarily establishes an upper limit of market value. However, it is an appropriate measure of the value itself only in exceptional circumstances where the relevant market for the property in question is difficult to define or where it is highly likely that the property would be replaced if destroyed.
>
> *McFarland v. Joint Sch. Dist. No. 365 in Elmore & Owyhee Cntys*., 108 Idaho 519, 522–23 (Idaho Ct. App. 1985) (internal citations omitted). The *McFarland* Court held that whether such circumstances existed in that case was a question of fact for the trial court to consider. *Id*. This case presents the kind of possible exceptional circumstances that should be considered by a jury [in] determining the fair market value of the property. MFR's motion (Dkt. 17) should be denied.
>
> Putting all of these leading Idaho cases together, *Farr West*, *Weitz*, *Adams* and *McFarland*, it is difficult to determine a clear, bright line damages rule. The following rules, however, emerge: Damages to property are typically limited to diminution in fair market value. Restoration costs are admissible evidence in determining fair market value and can be the appropriate measure of damages, even if the restoration costs exceed diminution in value, only in exceptional circumstances. Such exceptional circumstances are not limited by the case law, but include such considerations as where the market for the property is difficult to determine, where the property would likely be replaced, valuation by owner for "specific and personal reasons," and, perhaps, the requirements of justice.

*Id*. at 10–11. Put succinctly, Judge Bryan held that this case presented "the possible exceptional circumstances" that would allow for restorative costs to be included in the calculation of fair market value as the measure of damages.

> 2. *Decision on Motions in Limine (Dkt. 85)*

Prior to trial, the parties filed various motions in limine. As part of one of its motions, MFR argued that, consistent with Judge Bryan's decision, Plaintiffs should not be allowed to argue restorative costs were the proper measure of damages. In other words, *by its own admission*, MFR *recognized* that restorative costs could be a "relevant factor in determining the fair market value" of Cabin #16. Dkt. 59, at 5. It just did not want Plaintiffs arguing to the jury that such costs "are their measure of damages." *Id*.

In its decision, the Court reviewed Judge Bryan's decision and confirmed that "the damages in this case are the diminution of fair market value" because the cabin was permanently damaged, but not totally destroyed. Dkt. 85, at 19. Critically, however, the Court reiterated that "numerous benchmarks, including restorative costs" could be considered when reaching a number that represents the fair market value if the evidence supported their inclusion. *Id*. at 19–20. Consistent with MFR's admission, the Court then admonished Plaintiffs that they "[could not] say the damages are the costs of rebuilding" but could say "the costs of rebuilding are *part of* the damages because this case presents [] unique circumstances . . . ." *Id*. at 19 (emphasis in original).

In that decision, the Court also addressed certain evidence that could, and could not, be submitted at trial in support of Plaintiffs valuation and/or restorative costs arguments.

*Id*. at 21–25.

###### 3.  Timeframe for Damages

At the final pre-trial conference on the first morning of trial, the Court asked the parties their thoughts on whether damages should be determined using numbers from 2017 (immediately after the fire) or 2022 (the time of trial). Dkt. 106, at 17. The Court and counsel discussed the matter. *Id*. at 17–26. The Court then asked the parties to submit briefs prior to certain witnesses testifying about damages. *Id*. at 26.

The parties dutifully filed their briefs. Dkts. 92–93. In discussing the *timeframe* that should be used for calculating damages, the parties again reiterated their positions concerning fair market value and restorative costs. MFR took the position that the loss at issue here was permanent and because fair market value is the real measurement, the correct timeframe for damages was 2017—immediately before and after the fire. *See generally* Dkt. 92. Plaintiffs took the position that restorative costs should be calculated at the time of judgment as opposed to the time of loss. Dkt. 93, at 6. To reach this, Plaintiffs argued, *for the first time*, that the injury here was temporary, as opposed to permanent. *Id*. at 2–5. This is important because, up until this point, Plaintiffs had not made this argument.[10] They had accepted Judge Bryan's conclusion that the injury in this case was "permanent." Here, however, Plaintiffs argued Judge Bryan's language that there was a "permanent damage, but not total destruction" (Dkt. 22, at 9) meant the injury was temporary. Dkt. 93, at 3. This, however, contradicts Plaintiffs' own definitions on the same

---

[10] Plaintiffs hint at the idea that the injury here is not permanent in their original brief in opposition to MFR's Motion for Summary Judgment, but they never come out and say the injury is temporary. Dkt. 18, at 13–19.

page outlining that a permanent injury is one where land is "permanently injured, but not totally destroyed" and their admission that, in those cases, the owner is only entitled to the fair market value of the property. *Id*.

The Court must interject a concern it has had all along and that it will develop later in this decision: the conclusion that the injury here was permanent. Judge Bryan did an excellent job reviewing the relevant caselaw in Idaho on this topic. The problem, however, is those cases are somewhat contradictory and no case is directly on point with the facts of this case. As Judge Bryan noted, "it is difficult to determine a clear, bright line damages rule" based upon the Idaho Supreme Court's various rulings. Dkt. 22, at 10. Again, the fact that Plaintiffs changed their position (or at least clarified their position)[11] was a surprise to the Court. More importantly, Plaintiffs' changed position was unnecessary because restoration costs *can* be considered even in permanent destruction cases when unique circumstances are present.[12] The Court had already determined that there were likely unique circumstances present in this case and, assuming Plaintiffs proved those, they would be allowed to argue restoration costs were *subsumed* in the damage's calculation of fair market value. Thus, the Court's concern with Plaintiffs' changing position (and the underlying difference between a

---

[11] For example, in other motions, Plaintiffs do not affirmatively say their injury was permanent or temporary, they simply say they meet the "uniqueness" requirement allowing them to argue for restorative costs. *See, e.g.,* Dkt. 74, at 15–16.

[12] The Court realizes that its admission it has had a lingering concern on whether the injury was permanent or temporary may come as a shock to the parties. The reason the Court did not act on its concern was because: (1) the caselaw is not clear, but (2) as stated herein, the distinction does not ultimately matter. If the loss is considered temporary, restorative costs would clearly be allowed under Idaho law. But even if the loss is considered permanent, caselaw allows restorative costs to be used in special circumstances. The Court opted to proceed under the slightly more stringent standard of a permanent loss assuming if Plaintiffs could meet that burden, they could clearly meet the lesser.

temporary and permanent injury) was more academic than substantive.

The Court considered the parties' briefs regarding the timeframe to be used for damages and issued an oral decision on the third morning of trial. Dkt. 110, at 3–7. In sum, the Court reiterated, again, that because the damage here was permanent, the measure of damages would be the fair market value, but that Plaintiffs could present restoration costs *as part of* that value "assuming [they] can show exceptional circumstances" such as circumstances in which "the market is difficult to determine, where there are personal and specific reasons for valuation, or when justice so requires." *Id*. at 4–5. The Court went on to explain that the purpose of restorative costs was to restore the property to its prior state, not to restore Plaintiffs' economic state. *Id*. at 5–6. To fulfill that goal, the Court held Plaintiffs could submit damage costs in line with current (2022) rates as opposed to 2017 costs and rates. *Id*.

MFR's counsel asked the Court's opinion on a specific case he had cited in support of the position that costs should be measured from the time of the injury, not the award. *Id*. at 7. The Court indicated it did not find the case persuasive, but that it would explain why in a written decision following trial.

### 4. Jury Instruction 24

Consistent with the history recited above, when it came time to prepare instructions for jury deliberations, the parties were at odds.

Prior to trial, each side submitted proposed jury instructions. MFR submitted three instructions relative to damages. Dkt. 72, at 16–18. Its first proposed instruction on damages discussed damages as the fair market value; the second instruction defined the

term "fair market value;" and the third instruction discussed when replacement (or restorative) costs are appropriate. *Id*. Plaintiff, on the other hand, submitted one instruction. Dkt. 73-1, at 15. Consistent with its position earlier in the case, their proposed instruction told the jury it was up to them to decide between restoration costs and fair market value. *Id*. The instruction went on to define both terms. *Id*.

Consistent with its standard practice, the Court met *informally* with counsel to discuss any disagreement regarding jury instructions before holding a formal, on-the-record jury instruction conference. By design, that informal meeting was not memorialized in any way. The Court can represent, however, that many of the disagreements and discussions regarding damages outlined above came up during that meeting.

After lengthy discussions, the Court ultimately determined the damages instruction—Instruction 24—would read as follows:

> If the jury decides that the plaintiffs are entitled to recover from the defendant, the jury must determine the amount of money that will reasonably and fairly compensate the plaintiff[s] for any damages proved.
>
> The damages in this case are the fair market value of the property as it existed immediately prior to the events in question unless you determine special circumstances exist warranting consideration of the reasonable cost of necessary repairs within your award.
>
> When I use the phrase "fair market value" in this instruction, I mean the amount of money that a willing buyer would pay and a willing seller would accept for the item in question in an open marketplace, in the item's condition as it existed immediately prior to the occurrence in question.
>
> When I use the phrase "reasonable cost of necessary repairs" I mean the amount of money it would cost to restore the item in question to its condition as it existed immediately prior to the occurrence in question.
>
> In deciding whether to consider "reasonable cost of necessary repairs" or simply "fair market value" you should consider whether the market for the property is difficult to determine, whether the property would likely be replaced, valuation by the owner for specific and personal reasons, and the requirements of justice.

MEMORANDUM DECISION AND ORDER - 20

Dkt. 97, at 27.

At the Court's formal jury instruction conference, Plaintiffs' sole objection was to Instruction 24. They argued it did not "adequately describ[e] the scope of the remedy of the reasonable cost of necessary repairs." Dkt. 113, at 3. The Court noted Plaintiffs objection and overruled the same noting that, "[t]his was the hardest instruction to craft, but I think we got it right, and I am going to stick with it." *Id*. MFR likewise objected only to Instruction 24, arguing that it had been "established that this is a permanent injury to real property" and the "proper measure of damages is . . . the diminution in fair market value, and that places a cap on the amount of damages . . . ." *Id*. at 4. MFR went on to explain it felt "the exception" to the rule did not apply, that it was "inappropriate to allow the jury to consider replacement costs over and above fair market value," and that, in the event the jury was allowed to consider those types of costs, those costs should be limited to "the time of the loss, not the time of trial." *Id*. The Court overruled MFR's objection as follows:

> And again, I note the objection. I understand it. We discussed it last night. I'm going to overrule it.
> Again, this was the hardest instruction to craft. I believe that it fairly sets out the Idaho standard. This is a diversity case. I do believe the jury can consider costs above the fair market value in special circumstances if they find special circumstances, and this instruction gives them the opportunity to do that. So I am going to leave it as is.
> I will note for the record, I appreciate the thoroughness and—I'm not going to say competitiveness, but I don't know a better word—of the informal conference last night. I think you both represented your positions very well and very clearly and succinctly, and we are where we are now.

*Id*. at 4–5. The jury was provided Instruction 24—among other instructions—and ultimately found Plaintiffs had met their burden of establishing unique circumstances were

at play that allowed them to go above the static fair market value. The jury awarded Plaintiffs $1.5 million. As noted, the jury then apportioned fault 90/10 against MFR.

### 5. *Decision Following Trial (Dkt. 105)*

As noted, *see supra* Section III(C)(3), the Court told the parties it would issue a decision after trial memorializing its thoughts on a case MFR brought forth in support of its argument regarding the applicable timeframe for damages. In that decision, the Court included the full text of its oral ruling from trial and then summarized why it did not find the case MFR relied on persuasive as part of its ruling. Dkt. 105, at 3–7. The Court then noted the following "final thought:"

> During trial, both sides [alluded] to the fact that Judge Bryan's prior decision (Dkt. 22) was somewhat confusing and/or that he had conflated the principle of "permanent damages" and "temporary damages" and then, as a result, whether restorative cost could be considered in this case. The Court notes that neither party sought reconsideration before Judge Bryan. Neither party motioned for clarification. And neither party asked the undersigned to revisit Judge Bryan's decision. Thus, while both sides seem to agree certain critical language was confusing and could have benefitted from clarification, neither side sought to make that happen. This greatly concerns the Court.
> The parties operated as though the matter was settled but continue to argue against Judge Bryan's decision for various reasons.
>
> …
>
> Furthermore, the fact that both parties proceeded to trial based upon a ruling neither apparently agreed with does not follow principles of economy and efficiency.

*Id*. at 7.

Thereafter, MFR filed the instant Motion for New Trial on Damages or For Remittitur. Dkt. 120.

*6.  Motion for New Trial or Remittitur (Dkt. 120)*

In its Motion, MFR asserts Instruction 24 was erroneous and inadequate. Dkt. 120, at 1. As a result, it asks the Court to order a new trial on damages and find in its favor that fair market value is the accurate measure of damages or grant a remittitur and reduce the award to $350,000.00 (Brace's estimate of the fair market value of Cabin #16). Plaintiffs strongly oppose the motion. Dkt. 126.

a.  <u>Legal Standard</u>

The Court may "grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Reasons for a new trial include, but are not limited to, erroneous jury instructions, the failure to give adequate instructions, and excessive damages. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990); *Molski v. M.J. Cable*, Inc., 481 F.3d 724, 729 (9th Cir. 2007). A district judge also has "the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his conscientious opinion, the verdict is contrary to the clear weight of the evidence, or . . . to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Murphy*, 914 F.2d at 187 (cleaned up). When the Court determines that a new trial is appropriate because of excessive damages, Rule 59 also allows the trial court to grant a defendant's motion for a new trial or conditionally deny the motion, provided the plaintiff accepts a remittitur. *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).

MEMORANDUM DECISION AND ORDER - 23

b.  <u>Discussion</u>

MFR begins with a procedural note. It reviews the concerns the Court raised in its post-trial decision regarding the fact that neither party sought to revisit Judge Bryan's decision even though both affirmatively stated they had concerns with it. MFR goes on to "construe[] that suggestion to mean that in the absence of a motion to reconsider, the Court felt bound by Judge Bryan's opinion when crafting Jury Instruction 24." Dkt. 120-1, at 3. MFR then reminds the Court it is not bound by Judge Bryan's decision, that the Court needed to correct Judge Bryan's mistakes if it perceived any, and that the Court needed to craft Instruction 24 "based on an accurate interpretation of the law—not based on Judge Bryan's opinion of the parties' views." *Id*.

The Court appreciates MFR's candor. But to be clear, the Court did not craft Instruction 24 the way it did because it felt "bound" by Judge Bryan's decision. It crafted Instruction 24 the way it did—after conducting extensive research—to accurately reflect the applicable law. Besides not feeling "bound" in general to Judge Bryan's decision, the Court most definitely would not have felt bound to follow an erroneous ruling. As alluded to above, while the caselaw out of the Idaho Supreme Court in this area of law is complex, nuanced, and even contradictory at times, the Court has never felt that Judge Bryan's decision was *incorrect*. It simply shares Judge Bryan's frustrations with the inconsistencies in the caselaw and was itself frustrated that the parties consistently seemed to argue against Judge Bryan's decision but never addressed the decision itself. Said another way, the parties sometimes acted as if Judge Bryan's decision did not exist, repeating over and over the arguments already raised and decided. The Court's point in its post-trial decision was

to highlight these concerns and emphasize that the parties' decision not to do anything about that *order* was hard to square with their subtle, but constant, arguments against it. But the Court was not implying it blindly followed Judge Bryan's decision to an erroneous or inadequate end. Moving on.

The essence of MFR's motion sounds in its prior arguments. But this time it focusses more on the interplay between restoration costs and fair market value. Thus, the Court will forgo a review of the relevant cases—which are cited and explained above and/or in its three prior decisions—and begin where MFR begins.[13]

MFR reiterates that restorative costs should not be considered at all, but proffers that, in the event they are considered, they cannot exceed fair market value unless the damage to the property has no effect on the property's value. It then argues that damage does not affect a property's value when the damage is based simply on aesthetics. Candidly, these arguments are a bit confusing, circular, and further muddle Idaho caselaw. MFR's final argument is that restoration costs that are unreasonable or result in a windfall to Plaintiffs are not allowed.

Plaintiffs object on all fronts. They begin by arguing MFR is seeking to relitigate matters that have already been decided and/or that it is arguing positions it has long-since

---

[13] In doing so, the Court breezes over its prior concern about the difference between permanent and temporary injuries. Neither party brings up the distinction at the current juncture (besides a passing reference to Judge Bryan's decision and some caselaw). Thus, while this is an important distinction, the caselaw is very confusing and, as explained, it does not ultimately matter in this particular case because Plaintiffs are asserting the uniqueness of their property allows them to bring in restorative costs *even* under the permanent injury framework. And to repeat, if the injury is considered temporary, Plaintiffs would be allowed to argue these costs anyway. Frankly, the framework the Court has utilized *favors* MFR as it requires Plaintiffs to show they meet the exception to the standard rule.

waived (considering the Court's numerous prior decisions). While the Court understands Plaintiffs' frustrations that this is, quite literally, the fifth time the parties have brought up these issues, it also understands MFR's concern. As noted, this is a convoluted area of Idaho state law the Court is trying to navigate. Furthermore, now that a jury has found in favor of Plaintiffs, it is understandable that MFR would want to revisit the issue—and the specific instruction that led to the jury's conclusion. Thus, the Court will address this issue a final time in the context of Instruction 24.[14]

That said, the Court will not rehash the caselaw explaining that restorative costs *can* be considered as part of the value of a property if there are unique circumstances. MFR recognizes this; it just does not think the exception should apply in this case. Thus, to repeat, MFR is correct in its assertion that in circumstances where the restoration costs exceed the diminution in market value, diminution *may* limit recovery. But the rule is not of "invariable application" because "the goal of compensatory damages is reimbursement of the actual loss suffered . . . ." *Ransom v. Topaz Mktg., L.P.,* 152 P.3d 2, 6 (Idaho 2006) (cleaned up). This inquiry is very fact specific. To that end, the Court allowed Plaintiffs to present argument, evidence, and testimony regarding any unique circumstances they felt changed the value of their property and justified restorative costs above the fair market value as part of the damages calculation. They did just that. *Importantly,* MFR had an opportunity to cross-examine all of Plaintiffs' witnesses and to argue against the inclusion of restorative costs because there are no special circumstances at play. MFR did just that.

---

[14] Plaintiffs object to MFR's interpretation of caselaw. Candidly, the Court sees no reason to delve into the caselaw again because it has outlined the same repeatedly.

The Court then left the matter in the jury's hands because "whether such [exceptional] circumstances exist . . . is a question of fact . . ." Dkt. 22, at 10 (citing *McFarland*, 700 P.2d at 145).

Interestingly, the most unique aspect of this case that makes the damages award "just"—even though it is above fair market value—is not some subjective aesthetic element,[15] but the inaccessibility of Pistol Creek Ranch and the need to fly all materials in for building (and living). To be sure, Cabin #16 holds a special place in Plaintiffs' hearts. They testified to that end. But they also provided testimony concerning the tough real estate market in Pistol Creek Ranch and how most of those difficulties stem from the remoteness of the area. This, along with other factors, make the overall market very "difficult to define." As a result, an award above simple market value is appropriate under *McFarland* because there are unique factors at play and an above-market award better serves the ends of justice. *See* 700 P.2d at 145.

The problem with MFR's argument is it *recognizes* that in "exceptional situations" an award above "market value alone" is justified when "the plaintiff [] cannot return herself to the position she was in before [the] tort" occurred. Dkt. 120-1, at 10. It just doesn't think those circumstances exist in this case. Plaintiffs do. The Court does. And apparently the jury did as well. In a fact-intensive inquiry such as this where both sides were given ample opportunity to present evidence in support of their position, the Court will not overturn a

---

[15] MFR focusses a lot on aesthetics and the idea that aesthetic damage does not affect market value. Be that as it may, aesthetics are not the only measurement of "exceptional circumstances." As Judge Bryan noted, "such exceptional circumstances are not limited by the case law, but include such considerations as where the market for the property is difficult to determine, where the property would likely be replaced, valuation by owner for 'specific and personal reasons,' and, perhaps, the requirements of justice." Dkt. 22, at 11.

jury verdict simply because the losing side disagrees.

MFR also asserts Plaintiffs should not obtain a windfall and the Court's failure to put "guardrails" on Instruction 24 resulted in such an impermissible recovery.

The Court understands, and agrees, with MFR that windfalls should be avoided. But MFR's assertion that the award in this case constitutes a windfall is meritless because the jury awarded *exactly* what it will cost to rebuild Cabin #16—nothing more, nothing less. Such can hardly be called a windfall.[16] As the Court has already outlined, the purpose of restoration costs is to "restore the[] property owners to the position they enjoyed prior to a tortfeasor's interference." Dkt. 105, at 6 (*citing Weitz v. Green*, 230 P.3d 743, 759 (Idaho 2010)). In the Court's estimation, it is not Plaintiffs' position that results an unfair outcome, but MFR's.

It is undisputed that Cabin #16 is "worth" much less than $1.5 million. Because some time has passed since the prior estimates, the Court does not know the current market rate, but it feels comfortable representing that Cabin #16 is likely worth somewhere in the neighborhood of $300,000.00 and $500,000.00. That is the amount a buyer would be willing to pay, and the amount Plaintiffs would likely accept. But that does not restore Plaintiffs to their pre-loss condition.

Thus, to some degree the parties are looking at the issue differently. MFR is looking at the situation from the front end: what is the property (now destroyed) worth? If Plaintiffs

---

[16] Again, MFR's argument is based upon the premise that the correct measure of damages is $350,000.00. The Court agrees that *if* that were the correct measurement of damages, an award four times that amount would be a windfall. As explained, however, that is not the correct measure of damages.

were to have sold the non-destroyed property, how much would they have received? Whereas Plaintiffs are looking at the end result: what will it take to restore the property to its prior condition and place them back in the position they were before the injury?

As already noted, *see* Dkt. 105, at 3–6, the Court agrees with Plaintiffs. It would be unfair if MFR were required to only pay Plaintiffs $350,000.00, because they would not be "made whole" with that amount of money. *See Weitz*, 230 P.3d at 758. If the Court went along with MFR, the award meant to cure Plaintiffs' loss—a loss caused by MFR—would only partially restore Plaintiffs to the condition they were in before MFR's conduct. This does not make logical sense. The jury determined MFR's negligence was the "but-for" cause of the damage (the fire). Setting aside the contributory negligence issue in this case, it is MFR's duty to return Plaintiffs to the circumstances they found themselves in before its tortious actions. The only way to do that in this case is to award Plaintiffs the costs necessary to rebuild the Cabin as it existed prior to the fire. That the rebuilding costs are more than the market value costs is the reality of the uniqueness of the property. And Idaho law contemplates a situation, such as this, where the restorative costs exceed the fair market value. Caselaw explains such circumstances are rare, but none suggest the circumstances at issue here would not qualify.

Finally, and relatedly, MFR contends Instruction 24 did not include sufficient reasonableness and practicality language to help the jury understand that restoration costs still have limits, and their award could not be disproportionate to the cabin's fair market value. First, this concept, again, muddies the waters. There is no condition in Idaho caselaw that requires the restorative costs to be "related" to the fair market value. As the Court

explained in footnote 15, it is MFR's refusal to acknowledge that the damages in this case are higher than $350,000.00 that makes any award above $350,000.00 seem "disproportionate." Frankly, the award in this case is proportionate—it is exactly proportionate to the costs presented at trial.[17] Second, in addition to using the word "reasonable" four times, Instruction 24 reminded the jury that their award should be "fair" and could only "restore the item in question to its condition as it existed immediately prior to the occurrence in question." Dkt. 97, at 27. These were sufficient "guardrails" that curbed any runaway verdict.

A new trial on damages, or remittitur, is unwarranted in this case. MFR recognizes that "restoration costs may be an appropriate consideration in exceptional circumstances." Dkt. 132, at 4. It simply thinks the evidence and testimony in this case is insufficient to show those circumstances exist. The Court disagrees. More importantly, the jury disagreed. MFR had the opportunity to argue against the "exceptional circumstances" argument. It did so. Instruction 24 did not jump straight to restorative costs. It started with fair market value. It defined the term. *Then* it discussed restorative costs and under what circumstances such costs could be considered. Thus, the jury was left to decide for themselves.

The Court will uphold the verdict because it was not, as MFR suggests: i) unreasonably disproportionate to the damage suffered "to be unconscionable or so as to shock the conscience of the court"; (ii) "the product of a legal error"; or (iii) "more likely than not the product of passion or prejudice" on the part of the jury. Idaho Code § 6-807.

---

[17] Importantly, MFR did not have an expert of their own to opine on the costs of rebuilding Cabin #16.

MEMORANDUM DECISION AND ORDER - 30

The inclusion of the option to award restorative costs in Instruction 24 was proper because "the diminished-market-value rule would leave the Plaintiffs without a remedy for [MFR]'s damage to their use of their property. To leave them without a remedy would be to decide that by the wrongful act of another, [they] may be compelled to accept a change in the physical condition of [their] property, or else perform the work of restoration at [their] own expense." *Weitz*, 230 P.3d at 759 (cleaned up).[18] The award was supported by the evidence of exceptional circumstances and was not a windfall.

For these reasons, MFR's Motion is DENIED.

### D. Motion for Judgment as a Matter of Law (Dkt. 121)

In its final motion, MFR renews its motion for judgment as a matter of law on the premise that Plaintiffs' experts' testimonies were legally insufficient to lead to the conclusion the jury reached. Alternatively, it seeks a new trial to revisit the evidence surrounding causation.

### *1. Legal Standard*

"A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion. Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "If the judge denies or defers

---

[18] Plaintiffs and MFR cite heavily to *Weitz*. Again, the Court will not dissect that case it detail, but notes MFR's position that *Weitz* limits recovery when the injury does not diminish the property's market value is only half of the equation. Even when that is the case, the solution is not to cap recovery, but to look to principles of "reasonableness and practicality [which] provide more appropriate limits upon an award for restoration costs . . . ." 230 P.3d at 759. The jury's award here was reasonable and practical under the circumstances.

ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *Id.*

"[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Rather, the Court "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.*

The "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Harper v. City of L.A.*, 533 F.3d 1010, 1021 (9th Cir. 2008) (citation omitted). The Court "can overturn the jury's verdict and grant such a motion only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002) (cleaned up). If there is "sufficient evidence before the jury on a particular issue, and if the instructions of law on the issue were correct, then the jury's verdict must stand." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir. 1985) (quoting *Runge v. Lee*, 441 F.2d 579 (9th Cir. 1971).

Importantly, "[b]ecause it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *Go Daddy Software*, 581 F.3d at 961. "Thus, a party cannot properly 'raise arguments in its

post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion.'" *Id.* (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).

### 2. *Analysis*

To begin, MFR's Motion is proper. It previously raised a Rule 50(a) Motion during trial. Dkt. 112, at 110. And the substance of the motions is the same: an insufficient lack of evidence supporting Plaintiffs causation argument. In sum, MFR's current Rule 50(b) Motion is properly before the Court based upon its prior Rule 50(a) Motion at trial.

The problem, however, as the Court noted when denying MFR's Rule 50(a) motion at trial, is this is not the Court's "first rodeo" with these arguments. In its motion in limine years ago, MFR challenged Plaintiffs' fire investigator (Michael Koster), mechanical engineer (Richard Mumper), and chemical engineer (Douglas Byron). *See generally* Dkt. 34.[19] As noted, the Court took the position that some of the proffered opinions were "speculative" and "unsupported" and granted MFR's motion in limine to exclude that testimony. Dkt. 44, at 17–18. The Ninth Circuit reversed, holding that the Court had exceeded its gatekeeping role, overlooked relevant data, and abused its discretion by weighing the competing experts' testimony. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017 (9th Cir. 2022).

Now again, MFR asks the Court to revisit Koster, Mumper, and Byron's testimony

---

[19] MFR's original motion focused mostly on Koster, with Mumper and Byron playing a lessor role. MFR now pivots slightly and begins with Byron's failures and then asserts Koster and Mumper likewise fail because they relied on Byron.

from trial. In short, MFR proffers that Byron's testimony is not scientifically sound and that Koster's and Mumper's testimonies—which relied on Byron's testimony—are, likewise, flawed. As a result of these failures, MFR asks the Court to find Plaintiffs cannot meet their burden as to the cause of the fire.

Frankly, MFR's dispute boils down to Byron's opinion that a concentration of flammable vapors on or around the deck of Cabin #16 is what started the fire. MFR contends Byron's trial testimony that these vapors reached a level sufficient to cause ignition was based on an unreliable foundation. Specifically, MFR contends that Byron's testimony that vapors will ignite if they reach a concentration of one to seven percent and on the day of the fire the concentration was between one and seven percent because a fire started is circular and inadmissible. MFR's other arguments essentially flow from this initial concern that there is a lack of sufficient evidence regarding the cause and origin of the fire that burned down Cabin #16. Plaintiffs assert this argument—that underlies most of MFR's other arguments—is misplaced.

The Court agrees with Plaintiffs that MFR's "fuel-to-air" mixture argument is unduly myopic. First, if Byron had not brought up the precise one to seven percent measurement, MFR likely wouldn't have a leg to stand on. Said another way, if Byron had simply said that certain vapor mixtures can ignite (which he did) and that the mixture here was such that it could ignite (which he did), then MFR would simply have to accept his opinion (regardless of any specific percentages) because they never challenged his qualifications or his methodology; just his conclusion vis-à-vis the percentage explanation.

Second, even if Byron had not talked about percentages *at all*, the jury still could

have reached the conclusion that the vapor concentration was sufficient to cause the fire at Cabin #16. As the committee notes to Federal Rule of Evidence 702 explain, it is "recognize[d] that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts." Fed. R. Evid. 702 advisory committee's notes (2011). So, Byron could have talked about the science of flammable vapors, the conditions and circumstances present at and around Cabin #16 on the day in question, and then left the matter for the jury to decide. What's more, that Byron then put the pieces together for the jury was not wrong because it is "permissible for the expert[] to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts." *Id*. Thus, Byron's inference (what MFR calls circular reasoning)—that because there was a fire means the vapors had to be at a certain level—was an acceptable inference to make.

Again, MFR does not challenge Byron's specialized knowledge in this case. In fact, MFR did not produce a chemical expert to rebuff Byron's assertions and their fire investigator, Glenn Johnson, stated he had no reason to disagree with Byron's chemical analysis (even though he postured the conclusion was "circular"). Dkt. 112, at 161, 184–85. Critically, Johnson did not discount the possibility of self-heating or spontaneous combustion as a cause of the fire. *Id*. at 157, 164. His opinion was that the origin of the fire was "undetermined." *Id*. at 165. In short, even MFR's own expert could not fully discount Byron's opinions. That the jury apparently found Byron's opinions persuasive is, therefore,

no surprise.[20]

Byron may not have expressed an opinion on the exact percentage concentration of combustible vapors on the deck that day, but he reasonably drew an inference—based upon his *unchallenged* expertise and the chemical composition of the stain Brace used, the amount of stain Brace applied to the deck, the science of vapor concentration, and ambient conditions (i.e. temperature and wind) present—to reach a conclusion that was consistent with his professional training and experience. He testified point blank that as soon as the vapors reached the pilot light, it was not "a matter of if, [but] when." Dkt. 109, at 88–89. The Court is not in a position to call into question Byron's qualifications, methodology, or expertise. It will not call into question his conclusion either.

"The court's role is to determine the scientific validity of an expert's principles and methodology, not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record." *Elosu*, 26 F.4th at 1026 (cleaned up). The Court finds Byron's testimony was based upon scientifically valid principles and properly presented to the jury. Koster and Mumper's testimony that relied on Byron's

---

[20] To be sure, MFR's counsel and Byron went back-and-forth during trial on this issue. Like here, MFR's counsel claimed Byron's opinion was, "[because] the fire happened . . . therefore, the concentration must have been within that range [of one to seven percent]." Dkt. 109, at 117. Byron corrected MFR's counsel that what he was saying was the opposite: that the concentration was "in that range; therefore, there was a fire . . . ." *Id*. MFR's counsel responded that he was "using the fact of the fire to prove what the concentration of the vapors were, correct?" *Id*. at 117–18. To which Byron responded: "No, sir. You're not listening. You have to be in this range, or you're not – there's no fire. So, therefore, if it wasn't in this range, there wouldn't be a fire. Okay. So whichever way you want to go with the wordsmithing. This range is what it is, regardless of anything that goes on. But since there was a fire, that's your concentration." *Id*. MFR's counsel persisted: "So since there was a fire, it must have been the correct concentration?" *Id*. Byron's response: "No, sir. Since there was the correct concentration, there was a fire." *Id*. MFR's counsel concluded with, "Okay. I think we're saying the same thing, just different ways." *Id*. Byron responded with "No. You're –" but was cut off by MFR's counsel's next question. In sum, MFR sufficiently challenged Byron's opinions in front of the jury on this point and the jury was then allowed to draw their own conclusion from the testimony and argument.

analysis and conclusion is, therefore, likewise admissible.

Finally, MFR's other concerns about Koster and Mumper—regarding their expertise, their qualifications, the testing they performed, and what information they relied on in forming their opinions—are very similar to arguments the Ninth Circuit already rejected in this case. Consistent with the Circuit's holding, the Court finds Koster and Mumper's testimony at trial was reliable, based upon sound methodology, and adequately presented to a jury for consideration. Whether the Court agrees or disagrees with their conclusions is irrelevant.[21] The question is whether the testimony was relevant and based upon reliable methodology. The Court finds the testimony from these three witnesses meets that standard.

In sum, there was evidence on both sides regarding the origins and cause of the fire that burned Cabin #16. This case was a classic battle of the experts. Multiple opinions and theories were put forth during trial. Open questions existed. And those competing opinions and open questions required resolution by the finder of fact. Ultimately, the jury weighed the evidence and found in favor of Plaintiffs. Such was a possible outcome based upon the evidence—including that presented by Byron, Mumper, and Koster.

And "even [though] it is also possible to draw a contrary conclusion," from the evidence (i.e. the jury could have believed MFR's experts), the Court will not disturb the jury's findings in favor of Plaintiffs because that conclusion is supported by reliable

---

[21] In like manner, MFR could have, and in many instances did, cross-examine these witnesses on these topics and present counter evidence of their own. But disagreement with Koster and Mumper's conclusions cannot support a motion for new trial.

evidence from trial. *Harper*, 533 F.3d at 1021 (cleaned up).

Because there was evidence in the record, including expert testimony, to support the conclusion that the cause of the fire was based upon a concentration of vapors on the deck, the Court will not overturn the jury's determination.[22]

MFR's Motion for judgment as a matter of law, or alternatively, a new trial, is DENIED.

## IV. CONCLUSION

First, the Court need not amend its Amended Judgment because post-judgment interest will accrue as a matter of law.

Second, the Court will not amend its Amended Judgment because the landscaping costs MFR objects to are distinguishable from those already recovered and the insurance proceeds from Farmers are subject to subrogation.

Third, the Court will not order a new trial or remittitur of the jury's award of $1.5 million. The issue of damages, while confusing, was properly presented to the jury. The option for restorative costs was appropriately included. Instruction 24 was proper.

Fourth and finally, the Court will not grant MFR's motion as a matter of law or order a new trial based upon Plaintiffs' experts' testimony. The testimony was properly supported and the jury's verdict—whether it relied on that testimony or not—will not be disturbed.

---

[22] Lest it go unmentioned, the jury was never presented with an opportunity to explain *how* they determined the fire actually started. The Court does not know how much weight the jury placed on any single experts' testimony.

## V. ORDER

IT IS HEREBY ORDERED:

1. Plaintiffs Motion to Alter Judgment to include Post-Judgment Interest (Dkt. 116) is DENEID as MOOT.

2. MFR's Motion to Amend/Correct Judgment (Dkt. 119) is DENIED.

3. MFR's Motion for New Trial (Dkt. 120) is DENIED.

4. MFR's Motion for Judgment as a Matter of Law or for New Trial (Dkt. 121) is DENIED.

DATED: November 15, 2023

David C. Nye
Chief U.S. District Court Judge